## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:10CR387 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION & ORDER |
| | ) | |
| | ) | |
| BRIDGET M. McCAFFERTY, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

On September 14, 2010, the government filed a 26 count Indictment against six defendants, including Defendant Bridget M. McCafferty.[1] (McCafferty or the defendant). The Indictment grew out of an expansive investigation, conducted over a number of years, into allegations of public corruption and conspiracy in Cuyahoga County, Ohio. The charges against McCafferty were contained in Count 25, ¶ 390, and were limited to allegations that McCafferty violated 18 U.S.C. § 1001.

On February 8, 2011, the Grand Jury issued a Supplemental Indictment against the defendant. (Doc. No. 181.) The Supplemental Indictment had the effect of taking the five false statements indentified in the original Indictment as the false statements the defendant was alleged to have made, and separating them out into distinct counts. The Supplemental Indictment also included five new false statements that did not

---

[1] Along with McCafferty, defendants James C. Dimora, Robert W. Rybak, Jerry J. Skuhrovec, Michael D. Gabor, and William N. Neiheiser were also indicted. On December 7, 2010, the Court granted McCafferty's motion to sever her case from the other indicted defendants. (*See* Doc. No. 109.)

appear in the Indictment. In total, the defendant is now charged with ten counts of making false statements in violation of 18 U.S.C. § 1001.

Before the Court are a series of pre-trial motions filed by the defendant. Specifically, the Court shall address:

- the defendant's motion to suppress the fruits of the search of the defendant's private office and work space (Doc. No. 130);

- the defendant's motion to suppress evidence of intercepted wire communications (Doc. No. 132);

- the defendant's motion for discovery of the progress reports submitted in satisfaction of orders authorizing interception of wire communications (Doc. No. 127); and

- the defendant's motion for discovery of a written summary of expert testimony (Doc. No. 155).

The government initially responded to all motions, with the exception of the defendant's Rule 16(a)(G) discovery motion.[2] On January 27, 2011, the Court conducted a hearing on the motions. Following the hearing, the Court permitted supplemental briefing on various issues. (*See* Doc. No. 157.) The period set aside for briefing has passed, and the Court is prepared to rule on these pending motions.[3]

---

[2] Also pending are the defendant's motion to dismiss the Indictment for failure to state an offense (Doc. No. 134), motion to dismiss the Indictment for duplicity (Doc. No. 135), and the defendant's motion for a bill of particulars (Doc. No. 133). These motions, if the defendant does not withdraw them following the filing of the Supplemental Indictment, will be addressed in a separate Opinion and Order.

[3] This ruling pertains only to Defendant McCafferty, based upon the arguments raised and evidence submitted by the government and Defendant McCafferty in this severed case.

*Motion to Suppress Evidence from Office Search*

The defendant seeks to suppress the fruits of the September 23, 2008 search of the defendant's private office and workspace, based upon perceived deficiencies in the FBI agent's affidavit offered in support of the application that secured the search warrant. The government responded by representing that it does not intend to offer any evidence that was seized as a result of this search in its case-in-chief, but it reserves the right to use any such evidence to impeach the defendant's credibility if she chooses to testify at trial. *See Walder v. United States*, 347 U.S. 62, 65 (1954). The defendant was afforded any opportunity to respond to the government's "reservation," but failed to do so. Based upon the government's representation, the motion to suppress is DENIED as moot. Should the defendant choose to take the stand, and the government seek to impeach with evidence retrieved from the search, the Court, ruling in limine and without objection from the defendant, finds that the government may use the evidence for such purpose.

*Motion to Suppress Intercepted Communications*

The defendant also moves to suppress all evidence obtained from the interception of communications obtained pursuant to 18 U.S.C. § 2518 between December 5, 2007 and August 9, 2008. The defendant claims that total suppression of all communications is necessary because these conversations were captured in violation of her rights under the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968. At the outset, the Court observes that "[i]t is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a

3

violation of some constitutional or statutory right justifying suppression." *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979).

In her motion, the defendant claims that the orders authorizing the wiretaps failed to identify persons whose communications were to be intercepted, and failed to specify the scope of the interception. In addition, the defendant complains that the orders failed to meet the particularity requirement. Finally, the defendant challenges the government's minimization efforts.

The first application for interception of wire communications was filed by the government on December 5, 2007, and the first order of authorization was also filed on December 5, 2007. (*See* Doc. No. 132-1, attached compact disc.) While each subsequent application included different factual details, and identified new schemes as they were unearthed during the investigation, the defendant concedes that "[e]ach of the applications mirrored the original application […]." (Doc. No. 132 at 3.) The first order of authorization was also issued on December 5, 2007 (*see* Doc. No. 132-1, attached compact disc), and "each of the orders likewise mirrored the order issued on [December 5, 2007]." (Doc. No. 132 at 3.) Therefore, the analysis will apply equally to all applications and orders.

Title III allows an aggrieved person[4] to move to suppress the contents of intercepted oral or wire communications, or evidence derived from such communications,

---

[4] An "aggrieved person," for purpose of 18 U.S.C. § 2518(10)(a), is a person "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

obtained in violation of the statute. An aggrieved person may challenge the use of such

evidence at trial on the grounds that:

> (i)  the communication was unlawfully intercepted;
> (ii)  the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (iii)  the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).

*Specificity and Particularity*

Orders authorizing surveillance under Title III must include, among other

things, the identity, if known, of the persons whose communications are to be intercepted

and the nature and location of the place where the interception is to occur. The order must

also describe the type of communication to be intercepted, the particular crime to which it

relates, and the period during which interception is authorized. The defendant challenges

the sufficiency of the orders of authorization, alleging that they fail to identify the

persons whose communications are authorized to be intercepted and the communications

that are to be intercepted.

A review of the December 5, 2007 order reveals that the order authorizing

wire interceptions clearly includes in the court's findings the identification, by name, of

the known target interceptees and the target subjects.[5] (*See* Doc. No. 132, attached

computer disc.) No more is required under 18 U.S.C. § 2518(4)(a) (Section 2518(4)(a)

---

[5] Because the government has represented that certain individuals have yet to be indicted, the Court has determined that, in some instances, it would be inappropriate to include the names of various individuals in this Opinion and Order and will, instead, refer to the portion of the sealed record in which that information can be found.

provides that the order "specify the identity of the person, if known, whose communications are to be intercepted.")

Section 2518(4)(c) requires authorization orders to contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c). Each order specifies that "wire communications" may be intercepted.[6] *See* 18 U.S.C. § 2518(4)(c). In addition, the orders state that the wire communications are expected to concern:

> the manner, scope and extent in which the targeted interceptees interfere with interstate commerce by extortion under color of official right; […] the identities and roles of other conspirators, aider and abettors, and the role of each participant in the conspiracy and in the substantive violations of the Hobbs Act; the precise nature and scope of the illegal activities, including information about the receipt and delivery of bribes to public officials. […]

(December 5, 2007 Order Authorizing Interception, ¶ (b).) This same information is repeated in the instructions as to when the interception is to terminate. (*See id.* at p.4.) This description of the particular offense to which the intercepted wire communications are expected to relate is sufficient to satisfy § 2518(4)(c). *See, e.g., Shell v. United States*, 448 F.3d 951, 956 (7th Cir. 2006) (specificity requirement met when order stated wiretap of defendant would reveal discussion of gang business); *United States v. Spillone*, 879 F.2d 514, 517-18 (9th Cir. 1989) (specificity requirement met when order listed offenses under investigation, including violation of Hobbs Act, extortion, and conspiracy).

The defendant does not deny that this information is contained somewhere in the orders. Instead, she argues that the orders are constitutionally and statutorily

---

[6] Some orders provide for the interception of both "wire communications" and "electronic communications" (text messages). (*See* March 17, 2008 at p. 12-13.)

deficient because the information is not located in the provisions of the orders "authorizing" the interceptions. (Doc. No. 132 at 12.) She, however, provides no support for the position that this information must be located in a particular part of the orders, and the Court can find none. Rather, courts are directed to "look to the entire order to determine if it complies with the statute." *Spillone*, 879 F.2d at 517 (citing *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975)). When viewed as a whole, the orders clearly satisfy the specificity requirements, and the Court finds that the defendant's argument to the contrary lacks merit.[7]

*Minimization*

The defendant also moves to suppress alleging that the government failed to meet its statutory duty to minimize. In support of her argument, the defendant identifies 92 out of 44,290 communications that she believes demonstrate that the government failed to adequately minimize.[8]

---

[7] The defendant also complains that the minimization portion of the orders, which provides that "all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications *relevant to the pending investigation* [...]," is deficient because it does not "in any way attempt to describe the communications subject to interception with any particularity nor confine the scope of the interception [...]." (*See, e.g.*, December 5, 2007 Order at p.8 (emphasis added); Doc. No. 132 at 13.) Again, the defendant is attempting to compartmentalize the orders, inviting the Court to consider each section in a vacuum. However, when the December 5, 2007 Order is considered in its entirety, it is clear that the interception shall be limited to the illegal activity that is alleged in the Court's "findings" portion of the Order. Likewise, the Court rejects the defendant's challenge that the orders violate the particularity requirement of the Fourth Amendment. For the reasons already set forth, the orders describe with particularity "the telephone line[s] to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. 413, 427 n.15 (1977). *See* U.S. Const. amend. IV; *Shell v. United States*, 448 F.3d at 957 (rejecting argument that warrant amounted to a general order in violation of the Fourth Amendment because the application and warrant described the place to be searched and the conversations that were to be intercepted).

[8] At the motion hearing, counsel for both the defendant and the government agreed on the record that an evidentiary hearing on the subject of minimization was unnecessary. The Court granted the defendant leave to supplement her suppression motion with the additional calls she believed demonstrated the government's failure to minimize, and granted the government leave to respond to any supplement. Counsel agreed that this procedure would sufficiently place the matter before the Court for its determination. (*See* Doc. No. 157; and Doc. No. 166 at 1.)

Title III requires the government to conduct electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). To assess minimization efforts, the Court conducts "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Scott v. United States*, 436 U.S. 128, 136 (1978); *Feldman*, 606 F.2d at 677-78 (minimization efforts must be objectively reasonable). Title III "does not forbid interception of all non-relevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott*, 436 U.S. at 140. The government's minimization efforts need not be perfect; instead, the monitoring agents' actions need only be "reasonable."[9] *Scott*, 436 U.S. at 137-40. *See Feldman*, 606 F.2d at 678.

Before the Court can reach the merits of the defendant's minimization argument, however, it must address the issue of standing. The government contends that the defendant lacks standing to challenge minimization. A person's status as an "aggrieved person" under the statute does not confer upon them standing to challenge minimization. *See United States v. Fury*, 554 F.2d 522, 526 (2nd Cir. 1977); *United States v. Poeta,* 455 F.2d 117, 122 (2nd Cir. 1972); *United States v. Moore*, 811 F. Supp. 112, 118 (W.D.N.Y. 1992). Numerous courts have held that "even defendants who are named as targets of the investigation may lack standing to challenge law enforcement's

---

[9] Courts have phrased the reasonableness inquiry "the following way: '(t)he (minimization) statute is deemed to be satisfied if on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion.'" *Feldman*, 606 F.2d at 678 (internal citations omitted).

8

minimization techniques if they did not have an expectation of privacy in the residence in which the tapped phone was located." *United States v. Gallo,* 863 F.2d 185, 192 (2nd Cir. 1988); *United States v. Castillo-Martinez*, 2007 WL 1026363, *5 (W.D.N.Y. Apr. 2, 2007) (citing *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2nd Cir. 1991) (named target did not have an expectation of privacy in phone owned by another)). *See United States v. Vasconcellos*, 658 F. Supp. 2d 366, 382 (N.D.N.Y 2009); *Moore*, 811 F. Supp. at 118.

        Other courts have drawn slightly different lines, finding that a defendant "has standing to challenge minimization if the government 'overheard conversations of [the person] himself *or* conversations occurring on his premises, whether or not he was present or participated in those conversations.'" *United States v. Parks*, 1997 WL 136761, *11 (N.D. Ill. Mar. 24, 1997) (quoting *Alderman v. United States*, 394 U.S. 165, 176 (1969) (emphasis added)). *See United States v. Mavroules*, 813 F. Supp. 115, 117 (D. Mass. 1993) (defendant lacked standing where he did not contend that the tap was either "an unlawfully overheard conversation of [...] himself or conversations occurring on his premise"); *United States v. Suquet*, 547 F. Supp. 1034, 1038 (N.D. Ill. 1982) (citing *Alderman*, 394 U.S. at 176) ("[W]hen objecting to the introduction of a given call X, a defendant must show that he or she was a party to call X or that he or she has a privacy interest in the premises housing the tapped phone.").

        It is undisputed that the defendant did not have a possessory interest in any of the phones that were the subject of the wiretap orders issued in this case, nor did any of the intercepted calls take place on a tapped phone that was located at her residence. Consequently, and giving the defendant every benefit from the split of authority on this

subject, the Court finds that the defendant has standing only to challenge the calls to which she was a party, and, as set forth below, the Court has determined that there was no violation as to these calls. Nonetheless, in an abundance of caution, the Court shall evaluate the government's minimization efforts against the defendant's argument of statutory inadequacy.

Initially, the government must make a *prima facie* showing of reasonable minimization. *See United States v. Yarbrough,* 527 F.3d 1092, 1098 (10th Cir. 2008) (citing *United States v. Willis,* 890 F.2d 1099, 1102 (10th Cir. 1989); *United States v. Gray*, 372 F. Supp. 2d 1025, 1042 (N.D. Ohio 2005)). "Then, the burden shifts to the defendant to show that more effective minimization was possible." *Gray*, 372 F. Supp. 2d at 1042 (citing *Willis*, 890 F.2d at 1102). As to the defendant's burden, "it is not enough to identify particular calls which [she] contend[s] should not have been intercepted; [she] must establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (internal citations and quotations omitted). *See United States v. Thomas*, 2008 U.S. Dist. LEXIS 102801, *5 (N.D. Ohio Dec. 19, 2008). If the defendant fails to meet this burden, the Court will deny the motion to suppress, "even if the defendant has identified isolated instances where the [g]overnment failed to minimize non-pertinent conversations." *Gray*, 372 F. Supp. 2d at 1043 (citing *United States v. Armocida*, 515 F.2d 29, 45 (3rd Cir. 1975)).

In applying the reasonableness standard articulated in *Scott*, courts look to a variety of factors including: "the nature and scope of the criminal investigation; the [g]overnment's reasonable expectations of the character of conversations; and, the extent

of judicial supervision over the surveillance." *Feldman*, 606 F.2d at 678 (collecting cases); *see United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989); *Thomas*, 2008 U.S. Dist. LEXIS 102801, at *4. Courts may also consider the "point during the authorized period the interception was made[,]" *Scott*, 436 U.S. at 140; *see Parks*, 1997 WL 136761, at *13, as well as the government's internal monitoring of minimization. *Parks*, 1997 WL 136761, at *14 (citing *United States v. Dorfman*, 542 F. Supp. 345, 391 (N.D. Ill. 1982); *United States v. Villegas*, 1993 WL 535013, *9 (S.D.N.Y. Dec. 22, 1993)).

With respect to the nature and scope of the criminal investigation, "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more conversations will be permissibly intercepted because they will involve one or more of the co-conspirators." *Scott*, 436 U.S. at 140. *See United States v. Adams*, 759 F.2d 1099, 1115 (3rd Cir. 1985); *Parks,* 1997 WL 136761, at *12 ("The fact that this investigation was directed against a broad conspiracy eases the government's minimization burden."). The investigation further increases in complexity where the target interceptees intermingle conversations about legitimate business with those about corrupt business or illegal activity, *see United States v. Abscal*, 564 F.2d 821, 827 (9th Cir. 1977) ("The conversing conspirators frequently discussed non-narcotic-related matters at the beginnings of conversations [...]."), or when the participants use ambiguous or coded language. *See United States v. Bennett,* 219 F.3d 1117, 1124 (9th Cir. 2000) (recognizing that with "guarded or coded language, a higher rate of nonrelevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call"); *Abscal*, 564 F.2d at 827.

11

Here, there is no doubt that this case involves allegations of a large conspiracy with many identified and unidentified participants. The present Indictment, one of 9 filed following the government's investigation (in addition to 19 Informations filed by the government), charges fraud, corruption, obstruction of justice, making false statements to law enforcement and other federal offenses, which are alleged to have affected nearly every aspect of county government.[10] The Title III applications contain details regarding numerous schemes, some spanning over a decade, others involving shell companies, and still others relating to a series of complex financial transactions. Following the initial December 5, 2007 application, each subsequent application included newly discovered schemes and conspirators. The expanse and reach of the conspiracy clearly warranted more surveillance.

In addition, the sheer volume of the calls intercepted complicated the investigation. Approximately 44,000 phone calls were intercepted over a ten month period. *See Gray*, 372 F. Supp. 2d at 1044 (considering large number of intercepted calls as a minimization factor). The investigation was further hampered by the fact that the targets mixed conversations about legitimate business with those about corrupt activities. Because the targets were employed in lawful positions in the business and the public sectors, and because the alleged criminal conduct was so closely tied to these lawful positions, it is no wonder that the monitoring agents could not always immediately minimize an innocent call without some initial monitoring. The fact that the targets and co-conspirators were also friends and political allies, who relied on their professional and

---

[10] To date, at least 39 individuals, including three who were indicted with the defendant, have pleaded guilty or have been found guilty.

political relationships to further the conspiracy, compounded even more the difficult task of the monitoring agents by requiring them to determine whether a conversation regarding benign, personal matters might turn to criminal concerns.[11]

        Notwithstanding the breadth and complexity of the investigation, the government offers evidence to establish that it was still able to minimize over 1/3 of the calls over two minutes.[12] (Doc. No. 148-1, Title III Statistical Summary.)  Many of those

---

[11] One of the recorded conversations the defendant claims was not properly minimized illustrates this point. As discussed more fully below, the defendant's July 15, 2008 call to Russo (Def. Ex. D) was initially minimized because, at the outset of the conversation, the participants discussed the defendant's health. A spot check by an agent revealed that the parties were discussing a case on the defendant's docket wherein the defendant appeared to promise Russo that the case would receive her special attention. The defendant's subsequent denial that this conversation took place forms the basis for Count 10 of the Supplemental Indictment.

[12] The defendant insists that the Court should include in its analysis calls lasting less than two minutes, noting that the Sixth Circuit has yet to hold that calls less than two minutes cannot be minimized. Nonetheless, courts have consistently refused to consider calls lasting less than two minutes in minimization analyses, finding that it is extremely difficult to monitor and minimize very short calls. *See United States v. Mansoori*, 304 F.3d 635, 647 (7th Cir. 2002); *United States v. Apodaca*, 820 F.2d 348, 350 n.3 (10th Cir. 1987); *United States v. Fisher*, 2009 U.S. Dist. LEXIS 22847, *3 (E.D. Wis. Mar. 20, 2009); *United States v. Suggs*, 531 F. Supp. 2d 13, 21 (D.D.C. 2008). *See also Scott*, 820 U.S. at 140). At least two courts within this judicial district have refused to consider such short calls. *See, e.g., United States v. Galloway*, 2007 U.S. Dist. LEXIS 31070, *14 (W.D. Tenn. Apr. 27, 2007) (refusing to consider calls less than two or three minutes); *Gray*, 372 F. Supp. 2d at 1045 ("[M]onitoring during the first two or three minutes to determine the relevance of the call satisfies the minimization requirement.") Still, the defendant challenges the government's practice of monitoring calls for two minutes, noting that "to suggest that little of substance can be communicated in that time frame ignores the realities of our communications with one another. Two minutes of communication is not inconsequential. The Gettysburg Address was delivered in a little more than two minutes [...]." (Doc. No. 166 at 6.) The defendant misses the point. Courts excluding communications less than two minutes do not do so because short calls are always irrelevant. Rather, "[c]ourts have generally concluded that calls less than two or three minutes in duration are too short to minimize." *United States v. Lamantia*, 1996 U.S. Dist. LEXIS 14344, *38 (N.D. Ill. Sept. 30, 1996). This is especially true in conspiracies, such as the present case, where the participants often mixed legitimate discussions with that of criminal activity making it difficult, at first, to determine the nature of the call.

calls, 682 in total, were pertinent calls.[13] The statistics further reveal that the government treated each tapped line individually. For example, the Neiheiser Cellular Telephone contained the highest percentage of minimized calls, 56.28%. The majority of these calls were intercepted several months into the investigation, which demonstrates that the government became more adept at identifying non-pertinent calls as its understanding of the nature and scope of the conspiracy grew. *See Scott*, 436 U.S. at 141 ("During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinet calls which will not be intercepted thereafter."); *Parks*, 1997 WL 136761, at *13. As further evidence that the government tailored its interception of calls, with an eye toward minimization of non-pertinent calls, the government notes that 52.26% of calls to the  Dimora Home Telephone were minimized, while only 21.31% of calls (over two minutes) were minimized from the Dimora Cellular Telephone. The difference reflects the fact that the government understood that it was far more likely that non-criminal calls would be placed on the home line as it was used by other members of the Dimora family.

Nonetheless, the government acknowledges that a large number of "agent-designated non-pertinent" calls were captured during the wiretaps, but notes that the number is over-inclusive.[14] Some of the calls marked "non-pertinent" by the agents did

---

[13] At the motion hearing, counsel for the defendant stated that his client had no reason to doubt the government's statistics, and accepted them for purposes of the present motion.

[14] The government explained that "the designation of 'pertinent' and 'non-pertinent,' was given by agents at or around the time of the interception or on review thereafter, as a method for the prosecution team to later readily identify the conversations that would likely be used to support an indictment, exhibit at trial or sentencing hearing, disclosed as *Brady/Giglio*, or otherwise readily accessed. It is agent work-product, not a prosecutor's designation given with the full understanding of the term 'pertinent.' 'Non-pertinent' in this context does not necessarily mean irrelevant or unrelated to a Target Offense." (Doc. No. 148 at 8-9.)

14

contain information relevant to the conspiracy, such as information about a public official's receiving or expecting to receive a thing of value, including free meals, which is relevant to Hobbs Act violations. (Doc. No. 148 at 9, citing numerous intercepted calls.) Other calls designated by the agents as "non-pertinent" involved discussions between Target Interceptees about meetings, which sometimes revealed the identity of previously unknown participants. (*Id.*, citing numerous intercepted calls.) Thus, despite their designation for internal purposes by the agents as "non-pertinent," many of these calls were relevant to the investigation.

Moreover, the Supreme Court has cautioned that:

> blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer. Such percentages may provide assistance, but there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high yet their interception was still reasonable. The reasons for this may be many. Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination.

*Scott*, 436 U.S. at 140. As was the case in *Scott*, a significant number of the calls (the defendant concedes 30,222 of the 44,290) were less than two minutes in length. (*See* Doc. No. 166 at 6 n.6.) Because many of the non-pertinent calls were too short to minimize, and because they were captured during a wide-ranging conspiracy investigation, it would be inappropriate to place too much emphasis on the number of non-pertinent calls recorded.

As for the government's reasonable expectation of the character of the conversations, the government offers substantial evidence that the Target Interceptees and those they contacted employed ambiguous or coded language during their

conversations. (*See* Doc. No. 148 at 17 n.7, citing examples of ambiguous or coded language.) Employment of ambiguous language increases the challenge before the monitoring agents. *See Abscal*, 564 F.2d at 827; *United States v. Hoffman*, 832 F.2d 1299, 1308 (use of "coded language" is a factor which "militates strongly in favor of added leeway" in evaluating minimization efforts); *Gray,* 372 F. Supp. 2d at 1045.

    With the exception of Dimora's home telephone, each of the telephones monitored was a Target Interceptee's personal cellular telephone used primarily by the Target Interceptee. As the Court previously observed, the government minimized more than 50% of the calls made to the Dimora home telephone because it anticipated that many innocent calls may originate from this line. *See Parks*, 1997 WL 136761, at *13 (citing *United States v. Quintana*, 508 F.2d 867, 874-75 (7th Cir. 1974) ("Although the government must increase its minimization efforts when it has reason to expect a large volume of innocent calls, it might nevertheless conduct some monitoring during those times in order to determine that they are in fact innocent.")).  Likewise, the government did not even ask to monitor other home or work telephones, which were likely to receive a high number of innocent calls involving those inside and outside of the conspiracy. In sum, it is a clear that the government tailored its monitoring to focus on where and when it reasonably believed the majority of the relevant calls would be placed. *See Parks*, 1997 WL 13761, at *12.

    The Court now turns to a consideration of "the degree of judicial supervision over the surveillance practices." *See United States v. Angiulo*, 847 F.2d 956, 979 (1st Cir. 1988); *see also Feldman*, 606 F.2d at 678. In this case, judicial supervision, which included the bi-monthly review of progress reports, was more than adequate,

16

"which suggests that the agents complied with the minimization requirements." *Gray*, 372 F. Supp. 2d at 1045 (citing *Feldman*, 606 F.2d at 678). In addition, the government states, and the defendant does not challenge, that the monitoring agents were provided with a memorandum detailing the minimization requirements. The Assistant U.S. Attorneys who submitted the Title III Applications reviewed the summaries of the intercepted communications during the monitoring and confirmed that agents were minimizing conversations. These precautions establish that the supervision was sufficient to properly minimize non-pertinent calls.

In view of these circumstances, the Court concludes that the government has made a showing that its minimization efforts were objectively reasonable. The burden now shifts to the defendant to show a pattern of intercepting non-pertinent conversations. The defendant has not met this burden.

The defendant has identified a list of isolated instances where the agents intercepted non-pertinent conversations. The Court begins with the twenty-three calls indentified in the defendant's motion. Two of the conversations were less than two minutes, and were not subject to minimization. (*See* Def. Ex. K (1:37) and Def. Ex. I (1:08)). All of the remaining calls, except two, were minimized. (*See* Doc. No. 148 at 11.) Further, while the defendant complains that calls between various targets and their family members were intercepted, the government notes that certain family members were also identified as targets. (*See* Doc. No. 148 at 11.) It is not surprising, therefore, that all of the calls identified by the defendant in her brief, except Exhibit P, relate to a Target

Offense.[15] The two calls cited by the defendant that were not minimized (Def. Ex. J and L), related to a target's discussion with a family member about a personal matter. While the topic may seem far removed from the underlying conspiracy, the government notes that there was evidence that would suggest that the personal matter was being used as leverage to acquire a job in the county government, thus, providing a legitimate basis to monitor the call. (Doc. No. 148 at 12, citing 1569 Russo Cellular Telephone, May 2, 2008).

The defendant was permitted an opportunity to supplement her motion to suppress with additional calls that she believed would support her position. In total, the defendant identified 69 additional calls that she believed support a finding of a pattern of failure to minimize. Of these new calls, 4 were less than two minutes and were not subject to minimization. Even if the Court were to find that all 65 remaining calls, as well as the 21 calls over two minutes identified in the original motion, should have been minimized in their entirety,[16] it would amount to less than 00.2% of the total 44,290 calls intercepted.[17] This would fall far short of establishing "a pattern of interception of innocent conversations which developed over the period of the wiretap." *See e.g., Bennett,* 219 F.3d at 1124 (failure to minimize 3.65% of all calls, alone, insufficient to warrant suppression of all calls); *Lawson,* 780 F.2d at 540 (the defendant's sample of 117 out of 9,000 interceptions failed to establish a pattern of interception of innocent

---

[15] As for Exhibit P, 4:00 minutes out of the total 7:34 of the call were minimized. (*See* Doc. No. 148 at 11.)

[16] The Court notes that, of the remaining calls, 39 were at least partially minimized, so that the percentage of non-minimized calls is even more infinitesimal.

[17] If the Court engaged in the same analysis of the calls identified in the defendant's supplement, it would have come to the conclusion that the government did not fail to properly minimize these calls. (*See* Doc. No. 186 at 6-9).

conversations); *United States v. Torres,* 908 F.2d 1417, 1424 (9th Cir. 1990) (6 calls out of 1,052 intercepted did not establish pattern); *Gray*, 372 F. Supp. 2d at 1046 (12 communications out of 48,000 calls that the government reportedly failed to minimized did not establish a pattern).

Of course, if the monitoring agents did fail to minimize certain non-pertinent calls, this would not warrant the drastic remedy the defendant seeks. At most, suppression of only the non-pertinent calls that were improperly minimized would be warranted. *See United States v. Baltas*, 236 F.3d 27, 32 (1st Cir. 2001) ("[E]rrors in minimizing one particular interception within the context of a lengthy and complex investigation […] do not automatically warrant suppression of all the evidence."), cert. denied, 532 U.S. 1030 (2001); *see Gray*, 372 F. Supp. 2d at 1046. The First Circuit has noted that "in a particularly horrendous case, total suppression may be […] an appropriate solution," but the court also noted that the "sweeping relief" of complete suppression is only appropriate upon a showing of "taint upon the investigation as a whole […]." *Hoffman*, 832 F.2d at 1309 (While the district court suppressed 22 calls it believed to be improperly minimized, defendant was not entitled to total suppression because the "minimization effort, assayed in light of the totality of the circumstances, was managed reasonably.");  *see United States v. Mansoori*, 304 F.3d 635, 648 (7th Cir. 2002) (If the defendants were to prevail on their minimization argument, "the appropriate relief likely would be to suppress any conversation or conversations that were inappropriately monitored."); *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (district court properly suppressed only the call that violated the minimization order, and not the entire wiretap, where no evidence that entire investigation was tainted); *United*

19

*States v. West*, 2009 U.S. Dist. LEXIS 110828, *3 (E.D. Mich. Nov. 30, 2009) ("suppression of all wiretap evidence is only appropriate when the failure to minimize is egregious"); *Gray*, 372 F. Supp. 2d at 1046. The defendant has failed to offer any evidence that the entire investigation was tainted such that suppression of the entire wiretap would be warranted. The Court, therefore, turns to a consideration of the conversations the government is most likely to introduce at trial: the conversations involving the defendant.

There are six conversations involving the defendant that she claims were improperly intercepted. The first call (Def. Ex. A, April 18, 2008), lasted one minute and twenty-two seconds and was, therefore, not subject to interception. The second call (Def. Ex. B, May 27, 2008), which lasted only six seconds over the two minute mark, *see Gray*, 372 F. Supp. 2d at 1045 (considering calls less than two *or three* minutes too short to minimize), involved a call from McCafferty to Russo regarding an attorney who was appearing in a case before McCafferty. While the defendant insists that this was a purely innocent conversation regarding legislative matters (specifically, information that she gave to an attorney regarding the county reform issue), the government notes that the conversation was relevant because, in a conversation several days earlier between the defendant and Russo, the defendant had told Russo that she put the particular attorney in a room so that Russo could speak privately with him. (Call 2078, Russo Cellular, May 21, 2008.) The defendant also told Russo that she had continued a jury trial so that the attorney could assist Russo in responding to an anticipated newspaper article critical of Russo's hiring practices. (*Id.*) Earlier that afternoon, Russo and Dimora had a 21 minute

20

conversation regarding the Plain Dealer article.[18] In light of the fact that Russo and Dimora are alleged to have improperly attempted to influence judicial actions, and the article in question went to cronyism and the potential misuse of office, the Court finds the lack of minimization acceptable.

The third conversation (Def. Ex. C) occurred on June 29, 2008. By this time, the government had intercepted calls it believed demonstrated that Russo had communicated with the defendant and other judges, attempting to influence pending cases in several different courts. Specifically, with respect to cases before the defendant, the government believed that it had discovered evidence that demonstrated that Dimora had attempted to influence the outcome one of the defendant's cases. (*See* Def. Ex. W.) The conversation captured in Exhibit C between McCafferty and Russo focused almost exclusively on the Plain Dealer's article on cronyism in Russo's office.[19] Again, because the investigation raised allegations of misuse of office and public corruption, the Court finds that the government's failure to minimize this conversation violated neither the statute nor the Fourth Amendment.

The fourth captured conversation occurred on July 15, 2008. (*See* Def. Ex. D.) This call from the defendant to Russo was originally minimized, but on a spot check the monitoring agent heard Russo inquiring into a case pending on the defendant's docket. This call forms the basis for one of the alleged false statements identified in the Supplemental Indictment, and involves the defendant purporting to promise Russo to give

---

[18] Indeed, the relevancy of the calls involving this attorney was borne out by subsequent developments. (*See* Doc. No. 148 at 20-21.)

[19] The government notes that the defendant's boyfriend also worked in Russo's office. According to the government, the agents could reasonably have believed that the conversation could include issues related to his employment.

a case before her special attention for him. The government's treatment of this call was anything but improper, and illustrates the difficulties the monitoring agents faced in screening the intercepted calls. At the beginning of the conversation, Russo and the defendant spoke of the defendant's medical issues, and the monitoring agent minimized it as a personal conversation. It was only because of the agent's chance spot check that he realized that the participants had moved on to discuss matters arguably associated with the underlying conspiracies. Since this conversation was mostly likely overly-minimized, the defendant certainly cannot suggest that the government failed to properly minimize this conversation.

Defendant's Exhibit E involved a conversation lasting two minutes and seventeen seconds, barely over the two minute threshold, and involved the funeral arrangements for a mutual friend. A short time into the call, the defendant surrendered the phone to another individual, and she arguably has no standing to challenge this portion of the call. Nonetheless, the defendant complains that this call should have been minimized because the defendant identifies the reason for the call, a personal reason, at the outset of the conversation. As Exhibit D demonstrates, however, Russo and the defendant often mixed personal and business topics in their conversations. Moreover, it appears that the deceased's relative worked in the Auditor's Office.

Finally, McCafferty challenges the government's interception of an ex parte conversation between herself and Pumper, a litigant in a matter before her. (Def. Ex. W.) The call lasted only one minute and nine seconds, and was not, therefore, subject to minimization. Further, it is the government's theory of the case that this conversation demonstrates the defendant's bias in a case, a bias that Dimora attempted to exploit. (*See*

Indictment Counts 20-24.) Because the conversation appeared to relate to the effect of Dimora's efforts to influence cases, it was properly intercepted.

For all of these reasons, the conversations involving the defendant were properly captured and were not subject to minimization. Further, the defendant's motion to suppress all wire interceptions is DENIED.

*Production of Progress Reports*

McCafferty also seeks to compel the government to provide copies of progress reports that were submitted in compliance with the provisions in each of the orders authorizing interception of wire communications, and argues that the reports are "material to preparing the defense" and should, therefore, be produced under Fed. R. Crim. P. 16. (Doc. No. 127 at 5.)  The defendant maintains that she needs the reports to demonstrate that the government failed to minimize non-pertinent calls, and to demonstrate that the reports themselves were inadequate under 18 U.S.C. § 2518(6). (*Id.* at 5-6.)

A judge issuing a wiretap order under Title III may require that periodic reports be filed to aid the judge in determining "what progress has been made toward achievement of the authorized objective (of the wiretap) and the need for continued interception." 18 U.S.C. § 2518(6). The statute does not require the submission of such reports, and it is up to the issuing judge to determine whether, and at what intervals, such reports are to be filed.[20] *Id.*

---

[20] The Honorable Lesley Wells, the issuing judge, required the government to provide progress reports on the fifteenth and thirtieth days following the date of the respective orders.

"Courts generally recognize that a defendant's challenge to minimization does not depend on these reports." *United States v. Wright*, 121 F. Supp. 2d 1344, 1350 (D. Kan. 2000) As the court explained in *United States v. Orozco*, 108 F.R.D. 313 (S.D. Cal. 1985):

> disclosure of progress reports is not necessary in order to determine whether the government complied with the statutory requirements of 18 U.S.C. § 2510, et seq. Progress reports are, for the most part, a summary of information already provided to defendants, i.e. the tapes, summaries and logs. Those items already provided to defendants are the original and best sources of information regarding statutory compliance.

108 F.R.D. at 316; *see United States v. Birdman*, 1992 U.S. Dist. LEXIS 12155, *2 (E.D. Pa. Aug. 14, 1992).

Because these reports are merely summaries,[21] and provide no original information, courts routinely deny requests for such reports when they are sought to challenge the underlying applications and orders. *See, e.g., United States v. Pray*, 2010 WL 3448557, *5 (D.D.C. Sept. 3, 2010); *United States v. Koschtschuk*, 2010 U.S. Dist. LEXIS 13105, *11-*12 (W.D.N.Y. Feb. 16, 2010); *Birdman*, 1992 U.S. Dist. LEXIS 12155, at *4; *Wright*, 121 F. Supp. 2d at 1350. Having been provided with the applications, the orders, and the recordings of the original calls, the defendant already possesses the best source of information within which to evaluate the government's compliance with the statute. As such, she is not entitled to production of the reports to demonstrate minimization.

---

[21] In *Wright*, the court observed that a progress report is really a "summary of a summary, that is, [it is] the prosecutor's summary of the relevant line sheets which, in turn, are a periodic summary of the monitor log sheets. *Wright*, 121 F. Supp. 2d at 1350.

24

The defendant also seeks these reports, however, to show that the government failed to comply with the orders' requirements that reports be submitted pursuant to 18 U.S.C. § 2518(6). She argues, without support, that the failure to comply with the statutory provisions dictating the preparation and submission of such reports would require suppression of the intercepted communications. The Court is not persuaded.

Where required, progress reports are offered solely to aid the issuing judge, and the sufficiency of these reports is a matter for the issuing judge. *United States v. Marchman*, 399 F. Supp. 585, 586 (E.D. Tenn. 1975). Moreover, inasmuch as the reports are summaries prepared by law enforcement agents, courts have held that these reports fall within the parameters of Rule 16(a)(2) and are, therefore, excluded from discovery. *See Pray*, 2010 WL 3448557, at *2; *United States v. Chimera*, 201 F.R.D. 72, 77 (W.D.N.Y. 2001); *Birdman*, 1992 WL 203318, at *1. For these reasons, the Court also finds that the defendant is not entitled to the progress reports for purposes of showing compliance with § 2518(6).[22] The defendant's motion for production of the progress reports is, therefore, DENIED.

---

[22]As further evidence that these reports are not discoverable, the Court notes that § 2518(6) does not address the disclosure of progress reports, while §§ 2518(8) and (9) provide for and outline the procedure for disclosure of orders and applications. *See Orozco*, 108 F.R.D. at 316.

*Production of Written Summary of Expert Testimony*

Finally, the defendant has moved to compel the government to provide a written summary of the testimony of Lori Brown, an expert witness whom the government intends to call during its case-in-chief. The government has failed to file a witten opposition to this motion, and the time set by the Court for such a response has passed.

Rule 16(a)(1)(G) provides:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. […] The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G). On January 14, 2011, the defendant requested that the government provide her with a summary of the testimony of the government's expert witness, Lori Brown. The defendant contends that the government has failed to provide a response to her letter that would satisfy Rule 16.

At the January 27, 2011 motion hearing, the government indicated that it did respond to the defendant's January 14, 2011 letter by advising the defendant that Ms. Brown would be testifying as to various judicial canons, and by providing Ms. Brown's curriculum vitae. The Court finds this response lacking.

While the government no doubt expects the defendant to glean from its representation regarding Ms. Brown's testimony that the defendant's actions violated the judicial canons of which Ms. Brown plans to testify, this response completely fails to

26

meaningfully "describe the witness's opinions, the bases and reasons for those opinions […]." Fed. R. Crim. P. 16(a)(1)(G). The defendant's motion to compel is, therefore, GRANTED. The government is directed to submit a written summary of Ms. Brown's testimony that fully complies with Rule 16(a)(1)(G) within 10 days of this Opinion and Order.

*Conclusion*

For all of the foregoing reasons, the defendant's motion to suppress evidence of intercepted wire communications (Doc. No. 132) is DENIED, and the defendant's motion to suppress evidence from the search of her office (Doc. No. 130) is DENIED as moot. In addition, the defendant's motion to compel the production of progress reports (Doc. No. 127) is DENIED, and the defendant's motion for the production of a written summary of the government's expert witness (Doc. No. 155) is GRANTED.

**IT IS SO ORDERED**.

Dated: February 14, 2011

_____
 **HONORABLE SARA LIOI**
 **UNITED STATES DISTRICT JUDGE**