**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.1:10CR387 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| BRIDGET M. McCAFFERTY, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is Defendant Bridget McCafferty's motions for a new trial (Doc. No. 270), acquittal (Doc. No. 272), and arrest of judgment (Doc. No. 273). By incorporation, the Court also has before it all of the oral motions that the defendant made throughout the trial. On July 11, 2011, the Court conducted an evidentiary hearing on the motion for a new trial. For the reasons stated herein, the motions are DENIED.

**Background**

The charges against the defendant grew out of a federal investigation into allegations of public corruption in Cuyahoga County. On September 14, 2011, the government filed a 26-count indictment against six defendants, including the defendant, who was at all times relevant to the indictment, a judge on the Cuyahoga County Court of Common Pleas. Count 25 of the indictment charged the defendant with making false statements to an FBI agent during the course of an investigatory interview, in violation of 18 U.S.C. § 1001. Specifically, this count charged that the defendant made five separate

false statements during the interview. After the defendant challenged Count 25 as duplicative, the government filed a supplemental indictment, which had the effect of taking the five alleged false statements identified in the original indictment and separating them out into five distinct counts. The supplemental indictment also included five new false statements that did not appear in the original indictment. In all, the supplemental indictment charged the defendant with ten counts under 18 U.S.C. § 1001.

The trial began on March 18, 2011 with voir dire. The case proceeded to opening statements and testimony on March 21, 2011. The trial continued day to day for four days, and concluded with the jury charge on March 25, 2011, whereupon, the jury returned its verdicts of guilty on all ten counts. (Doc. No. 256.) Subsequently, the defendant filed the motions for a new trial, acquittal, and arrest of judgment currently before the Court. The defendant incorporates by reference and reasserts her prior pretrial motions, and her oral motions and objections made before, during, and after trial, including her Rule 29 motion for acquittal, as well as the arguments in support of those motions and objections.

**Motion for New Trial**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). While the rule fails to define the interest of justice, "it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred. *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (citing *United States v. Wall*,

2

389 F.3d 457, 474 (5th Cir. 2004)).[1] When presented with a Rule 33 motion, the district court may weigh the evidence and assess the credibility of the witnesses; "[it] has often been said that [the trial judge] sits as the thirteenth juror." *United States v. Ruiz Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003) (citation omitted). Whether to grant a Rule 33 motion is left to the sound discretion of the district court, *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008), and the defendant bears the burden of proving that a new trial is warranted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994).

The defendant argues that the Court should grant her a new trial for the following reasons: (1) the government withheld exculpatory material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); (2) the Court erred when it prohibited the defendant from introducing an audio recording during cross-examination of a government witness; (3) the Court erred when it permitted the introduction of a voice mail message left by the defendant to a co-conspirator; (4) the admission of the testimony of an expert witness on the subject of the Ohio Code of Judicial Conduct was highly and unfairly prejudicial; (5) admission of a recorded conversation between two co-conspirators under Fed. R. Evid. 801(d)(2)(E) violated the defendant's rights under the Fifth and Sixth Amendments; and (6) the denial of her pre-trial motions and the Court's refusal to give certain proposed jury charges entitle the defendant to a new trial. The Court will address each argument in turn.

---

[1] A defendant may also obtain a new trial on the ground that "the [jury's] verdict was against the manifest weight of the evidence," and for newly discovered relevant evidence. *Id.* (internal citation omitted); *see United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006).

1.          <u>Nondisclosure of Evidence did not Constitute a *Brady* Violation</u>

As her first ground for a new trial, the defendant claims that she was denied timely *Brady* material because the government failed to disclose that, immediately prior to her trial, Frank Russo, one of the government's witnesses who was at all times relevant to the indictment the Cuyahoga County Auditor, requested mental health counseling.[2] The government concedes that it failed to reveal this information to the defendant, but claims that this omission does not rise to the level of a *Brady* violation. On July 11, 2011, the Court conducted an evidentiary hearing on this issue.

On March 9, 2011, attorneys from the U.S. Attorney's Office sent a letter to McCafferty's counsel detailing information relating to Russo's presentence investigation report. (*See* Doc. No. 279, filed under seal.) While Russo stated in his interview that he did not believe that he would benefit from any type of counseling, he admitted that he suffered from anxiety and took medication (on an as needed basis) for that affliction**.** (Doc. No. 279, March 9, 2011 letter.)

On March 14, 2011, Russo spoke with U.S. Pretrial Services and indicated that he was experiencing increased anxiety about his legal situation. Pretrial Services suggested that he avail himself of mental health counseling services. After consultation with his attorney and further discussion with U.S. Pretrial Services, Russo agreed to

---

[2] As set forth more fully below, the Court would not characterize Frank Russo, as the defendant has, as a "key government witness." To be sure, Russo testified to some of the purported ethical violations that the defendant was alleged to have been covering up during her interview with FBI agents in September, 2008. As to the charges in the supplement indictment, however, the more damaging evidence came in the form of the defendant's own voice in various recorded telephone conversations, and the testimony of the defendant's bailiff, who testified as to the defendant's concern regarding her exposure due to ex parte communications she engaged in with parties and third-parties to actions on her docket. Nonetheless, for purposes of this motion for a new trial, the Court will treat Mr. Russo's testimony as though it was critical to the government's case.

4

request counseling. On March 22, 2011, Russo testified as a government witness against the defendant. That same day, March 22, 2011, Pretrial Services sent an email to AUSA Ann Rowland inquiring as to the government's position on Russo's request for counseling. Rowland was on vacation, and did not respond until the following day, when she advised Pretrial Services that the government took no position on the request. Also on March 23, 2011, probation submitted to the Honorable Kathleen O'Malley Russo's request for mental health counseling. The request by Suzanne Evans of Pretrial Services to Judge O'Malley provided, in part, that:

> On March 14, 2011, the defendant informed Pretrial Services that he has been experiencing a lot of anxiety due to his legal situation. The defendant asked if he could participate in mental health counseling while on bond.

 (*See* Case No. 1:10-cr-384, Doc. No. 24.) The Order granting the request was docketed in Case No. 1:10-cr-384 on March 25, 2011, the last day of the McCafferty trial.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "a defendant's due process rights are violated where the government withholds evidence favorable to a defendant that is 'material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Id*. at 87. Subsequent Supreme Court precedent, including *Giglio v. United States*, 405 U.S. 150 (1972), determined that *Brady's* duty of disclosure encompasses not only exculpatory evidence but impeachment materials as well. *Giglio*, 405 U.S. at 154.

Information is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United*

*States v. Garner*, 507 F.3d 399, 405 (6th Cir. 2007). "[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler v. Greene,* 527 U.S. 263, 289-90 (1999).

In *Strickler*, the Supreme Court summarized that a *Brady* violation occurs when: (1) evidence is favorable to the accused because it is exculpatory or impeaching; (2) evidence was suppressed by the government, either willfully or inadvertently; and (3) prejudice ensued. *Strickler*, 527 U.S. at 281-82. *See Brooks v. Tenn*., 626 F.3d 878, 892 (6th Cir. 2010). The prejudice prong requires the defendant to satisfy the previously outlined "materiality" inquiry. *See Strickler*, 527 U.S. at 282.

At the evidentiary hearing, Russo testified that he spoke by telephone with Suzanne Evans, his Pretrial Services officer, on a weekly basis, and met with her in person once a month. Russo testified that, on March 14, 2011, during one of their monthly meetings, Russo advised Evans that he was experiencing a lot of anxiety about his legal situation, which included his impending 22 year prison sentence and the prospect of testifying at the criminal trials of the defendant and others.[3] He further testified that Evans suggested that he seek mental health counseling while he was out on bond, and indicated that many of her clients take advantage of this program offered

---

[3]Russo explained that, on the day he met with Ms. Evans, he had just prepared his ethics form, was in the midst of preparing to testify in his first trial, and was only weeks away from the date he was to report to prison to begin serving his sentence. Russo summed it up by saying "[t]here just happened to be a lot going on that day [...]."

through Pretrial Services.[4] While he admitted that he was not initially "keen" on the idea, after consulting with counsel, he decided that he wished to pursue counseling.[5] He stated that he now participates in counseling on a weekly basis.[6]

Of course, it would be normal for an individual in Russo's situation, facing a long prison term and the prospect of testifying under uncomfortable circumstances in high profile trials, to experience increased anxiety. As such, Russo's request, alone, does not demonstrate a "significant deterioration in his mental health" as the defendant has suggested.[7] Further, Russo testified that there was nothing about the added anxiety that he was experiencing that affected his mental facilities or his ability to discern and testify as to the truth at trial. As such, it cannot be said that there is a

---

[4] In connection with the hearing, the defendant sought to elicit the testimony of U.S. Pretrial Services Officer Suzanne Evans. The government moved to quash the subpoena. In an order dated July 8, 2011, the Court, relying upon the 18 U.S.C. § 3152, as well as the regulations promulgated there under, ruled that it would determine after Russo's testimony at the hearing whether it would permit Ms. Evans to testify. (*See* Doc. No. 353.) Following Russo's testimony, it became clear to the Court that the information sought through the subpoena was either already known to the defendant or was otherwise available from Frank Russo. This was especially true in light of the fact that the government had already conceded that it failed to inform the defendant of Russo's request, and had produced the email correspondences between Pretrial Services and the U.S. Attorneys' Office relating to the request. The Court, therefore, granted the motion to quash.

[5] At the evidentiary hearing, defense counsel suggested that Russo's testimony was inconsistent with the request for counseling submitted by Suzanne Evans. Specifically, while Russo testified that it was Evans who suggested that he seek counseling, the request submitted to Judge O'Malley indicates that Russo was making the request. The Court finds no inconsistency. Russo testified that it was Evans who suggested that he take advantage of a program of which he was previously unaware. Upon consideration, and consultation with counsel, Russo agreed that he wanted to request counseling and conveyed his desire to seek counseling to Ms. Evans. Ultimately, the request came from Frank Russo, and Ms. Evans accurately reported this to Judge O'Malley.

[6] Even though the defendant attempts to treat Russo's request as evidence of a "significant deterioration" of his mental condition, there is no record evidence that Russo's condition had "deteriorated" to the point that necessitated Russo taking anxiety medication that he had been prescribed four years earlier to use on an as needed basis. In fact, the record testimony indicates to the contrary. In the *Terry* trial, upon cross-examination, Russo testified that his increased anxiety, which eventually led him to take advantage of the counseling program, did not require him to take anxiety medication. (Evidentiary Hearing Def.'s Ex. C, *Terry* TR at 127.)

[7] The Court observes that throughout the briefing in these post-trial motions, the defendant has repeatedly exaggerated and misstated the record to support her arguments.

reasonable probability that had the jury been aware of this increase in anxiety the result at trial would have been different, nor can it be said that the absence of this information at trial undermines the confidence in the outcome *See United States v. Love*, 329 F.3d 981, 985 (8th Cir. 2003) (quoting *United States* v. *Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001) (further citations omitted) (noting that while a defendant has a right to challenge a witness's credibility with competent or relevant evidence of any mental defect or treatment, "[to] be relevant, the mental health records must evince an 'impairment' of the witness's 'ability to comprehend, know, and correctly relate the truth.'"))

In addition, the Court cannot overlook the fact that the defendant already knew that Russo suffered from anxiety, but chose not to pursue this line of impeachment at trial. "Brady cannot be violated if the defendants had actual knowledge of the relevant information or if the documents are part of public records […]." *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997) ("the jury had information with which to evaluate Dotey's credibility, though perhaps not as much information as appellants would have liked"). Further, "[e]vidence that is 'merely cumulative' to evidence presented at trial is 'not material for purposes of Brady analysis.'" *Brooks*, 626 F.3d at 893 (quoting *Carter v. Mitchell*, 443 F.3d 517, 533 n.7 (6th Cir. 2006)).

The impact of the withholding of this information is further minimized by the fact that Russo was impeached on other, more significant, grounds. *See Brooks*, 626 F.3d at 893 (where witness was impeached by prior convictions and for his actions as a known jailhouse snitch, withheld evidence of mental illness and specific exploits as an informant did not rise to the level of a *Brady* violation); *Zagari*, 111 F.3d at 320 (admission of withheld evidence less likely to have changed the result where the

8

government's witness was otherwise impeached). The defense chose not to impeach Russo on his medical conditions, including his anxiety, but decided to impeach him with his convictions, which followed his guilty plea to a variety of charges involving public corruption; his proffer agreement with the government whereby the government agreed to recommend a reduction in his sentence in exchange for his cooperation; as well as a multitude of other grounds, reflected in the cross-examination. As such, the jury had before it considerable evidence which called into question Russo's credibility as a witness, and it cannot, therefore, be said that this additional withheld evidence was likely to have altered the result. *See, e.g., United States v. Perez-Ruiz*, 353 F.3d 1, 9 (1st Cir. 2003) (A delay in providing evidence relating to a key government witness's mental health did not violate the defendant's constitutional rights where defense counsel was able to cross examine the witness using other evidence, "such as [the witness's] status as both a confessed drug dealer and a cooperating witness.")

Moreover, the defendant was not convicted solely on the basis of Russo's testimony. At trial, the government introduced several recorded conversations between Russo and the defendant, as well as the testimony of the defendant's bailiff and the FBI agents who interviewed the defendant. This evidence also supported a finding that the defendant lied to the FBI in violation of 18 U.S.C. § 1001. *See Zagari*, 111 F.3d at 320 (suggesting that the withholding of impeachment evidence might have risen to a *Brady* violation if the witness's testimony had been the only evidence convicting the defendant and the witness had not been otherwise impeached).

Considering the cumulative effect of the suppressed evidence in light of the other evidence presented at trial, it is clear that the failure to disclose Russo's request

9

for counseling was not material, and, in no way, undermines the confidence in the outcome at trial such that a new trial is necessary.

2.          Cross Examination of Frank Russo was Properly Limited

Three of the ten charges involved statements wherein the defendant was alleged to have denied that James Dimora, then Cuyahoga County Commissioner and Chairman of the Democratic Party for Cuyahoga County, had attempted to influence, intervene or involve himself in any cases before the defendant's court. Two other counts alleged that the defendant lied to FBI agents when she denied that she tried to sway a case involving DAS, a corporation for which Steven Pumper served as president. It was the government's theory that Dimora attempted to intervene in the DAS litigation to benefit Pumper, one of his political allies, and that the defendant lied about Dimora's involvement in the case, and about the efforts the defendant allegedly took to facilitate a settlement of the litigation that would favor Pumper and his company.

In support of these charges, the government offered the testimony of Frank Russo, long-time County Auditor for Cuyahoga County and personal friend of the defendant. On direct examination, Russo testified that he remembered attending a political fundraiser with Dimora sometime "in 2008" in the Tremont area, in which the defendant was also present. (Doc. No. 286, Russo TR at 39.)[8] He further testified that Dimora, who while he was on the phone with some unknown individual, indicated to the defendant that she was making him "look foolish with Steve." (*Id.* at 40.) At that moment, Steve Pumper entered through the front door of the restaurant, and Dimora

_____

[8] Russo described Tremont as a section of Cleveland with "a lot of bars and restaurants and art studios and that sort." (Russo TR at 39.)

signaled for Pumper and McCafferty to speak privately. (*Id*.) While Russo observed the two speaking, he indicated that he did not hear the conversation between the defendant and Pumper. (*Id*. at 41.)

On cross examination, Russo stated that he was not sure which restaurant hosted the fundraiser, though he indicated that it might have been a restaurant called "Fahrenheit." (Russo TR at 42.) He also did not know whose fundraiser it was, but conceded, in response to questioning, that it could have been for Brendan Sheehan, a democratic candidate for common pleas judge, though he was not "100 percent" sure. (*Id*.) Russo explained that a number of judges were running that year, and he had two or three fundraisers to attend that evening. (*Id*.)

Defense counsel then sought to play a recording of a conversation between Russo and Dimora discussing the two men's plans to attend Brendan Sheehan's fundraiser.[9] While the phone conversation was recorded on May 29, 2008, no date, however, was given as to when the fundraiser was to have taken place. (*See* Doc. No. 270 at 5-6.) The government objected to the playing of this tape, and the following occurred at sidebar:

***

THE COURT: Refresh my memory. Are you doing it to refresh his memory. Do you have a transcript?

MR. MURRAY: No. I wanted to be able to play a tape.

THE COURT: At the end of the proceedings yesterday, I made it clear that even though you were given great leeway for the use of documents in cross-examination, you were going to strictly follow the rules relative to the use of evidence to refresh a person's memory.

_____

[9] The alleged import of the call was that it took place after the DAS litigation was resolved. (Russo TR at 46.)

You made use of the evidence, but it's not to be—if you have the transcript of the conversation, you can show it to see if it refreshes the witness's testimony, but I don't understand how you using this piece of evidence for that purpose—if you are going to play it to the jury, it would be inappropriate.

MR. MURRAY: But—

THE COURT: You're using it to refresh the witness's memory?

MR. MURRAY: And to ask him did he go to that fund-raiser that night, because it's going to be relevant whether he went to that fund-raiser.

MS. BACON: I don't see—Your Honor, he didn't testify that the fund-raiser was on a particular date. He said it was spring of 2008. He went to Tremont on one day. It doesn't mean he wasn't in Tremont on another night.

\*\*\*

MR. MURRAY: This is crucial for getting in the fact of whether he's telling the truth here about these fund-raisers. This whole conversation that he claims occurred, we think, is made up. We think this helps prove that it couldn't have happened.

And we have to be permitted at least to cast some doubt on this testimony by confronting him with the fact that there's a recording of him and Dimora going to a fund-raiser with Brendan Sheehan and going to the Tremont area. And that does fit with what he said, which was that it might have very well have been at the Fahrenheit.

MS. BACON: It might very well have been. He thinks it's possible. It's possible it was for Brendan Sheehan, because a lot of judges were campaigning at that time.

I think to take one event that he was able to find a recorded conversation that happened later that happens to match the description doesn't mean that the witness isn't being truthful.

\*\*\*

THE COURT: Unless you have something more, some use other than to try to refresh this witness's testimony, at this point, I'm not going to permit it.

12

MR. MURRAY: Your Honor, I just want the record to be—this is—this is depriving the defendant of her Sixth Amendment right to confront the witnesses and to present a defense of her case.

(Russo TR at 44-50.) Ultimately, the Court permitted the defendant to use a transcript of the call to attempt to refresh the witness's recollection, but it did not serve to refresh his recollection as to when the fundraiser in question took place, and whether it was, indeed, for Brendan Sheehan. (*Id.* at 83-84.) The defendant was not, however, permitted to use the tape to impeach Russo's testimony.

The Sixth Amendment affords a criminal defendant "the right […] to be confronted with the witnesses against him." U.S. Const. amend VI. This right has been construed "as a right to subject the testimony of witnesses against the defendant to adversarial cross-examination." *United States v. McClesky*, 228 F.3d 640, 643 (6th Cir. 2000). The Confrontation Clause does not guarantee "cross-examination that is effective, in whatever way, and to whatever extent, the defense might wish." *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985); *United States v. Hunt*, 521 F.3d 636, 644 (6th Cir. 2008). Indeed, the trial court has the authority to limit the scope of cross-examination for purposes of curtailing harassment, prejudice, or confusion. *Miskel v. Karnes*, 397 F.3d 446, 452 (6th Cir. 2005). "In determining whether a trial court has abused its discretion in allowing only limited cross-examination as to motive, bias, or prejudice, a reviewing court must decide 'whether the jury was otherwise in possession of sufficient information concerning formative events to make a 'discriminating appraisal' of a witness' motives and bias.'" *Stevens v. Bordenkircher*, 746 F.2d 342, 347 (6th Cir. 1984) (quoting *United States v. Touchstone*, 726 F.2d 1116, 1123 (6th Cir. 1984) (further citations omitted.))

13

"A party ordinarily may introduce extrinsic evidence to impeach testimony by contradiction if the extrinsic evidence concerns a subject that is not collateral to the issues being tried." *United States v. Verdugo*, 617 F.3d 565, 578-79 (1st Cir. 2010) (citing *United States v. Cruz-Rodriguez*, 541 F.3d 19, 30 (1st Cir. 2008)). *See United States v. Klein*, 187 F.2d 873, 876 (7th Cir. 1951) (citing *Ewing v. United States*, 135 F.2d 633 (D.D.C. 1942) ("When evidence goes to challenge directly the truth of what the witness has said about matters material to the issue on trial, it cannot be called (collateral). Such evidence is admissible by way of impeachment or contradiction without regard to whether the witness contradicted has been asked about it.")); *see also* Fed. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness."); Fed. R. Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.")

Here, however, the recorded conversation between Dimora and Russo was not properly offered as impeachment because it did not contract Russo's testimony. The fact that Russo and Dimora had a discussion on May 29, 2008 regarding plans to attend Brandon Sheehan's fundraiser did not contract Russo's testimony that sometime in 2008 he and Dimora attended a fundraiser for some candidate, who may or may not have been Brandon Sheehan, and where Pumper and the defendant had a conversation at the suggestion of Dimora. Because such evidence could not serve to impeach Russo, it would

have been improper to permit the defendant to use it for that purpose.[10] *See, e.g., Verdugo*, 617 F.3d at 579 (A videotape of the defendant's arrest "was properly excluded whether or not it was collateral because it simply did not contradict [the arresting officer's] testimony.")

Notwithstanding this proper limitation on the scope of cross-examination, the defendant was still permitted substantial leeway to "delve into the witness's story to test the witness' perceptions" as well as to "impeach, i.e., discredit, the witness." *See Davis v. Alaska*, 415 U.S. 308, 316 (1974). On cross-examination, defense counsel tested Russo's memory, at length, with respect to the details of the fundraiser in question. (Russo TR at 75-80.) Her counsel was also able to elicit admissions from Russo that he lied by holding himself out as honest and hard-working (*Id*. at 64-65), and that he could not recall the names of other party-litigants on whose behalf he contact the defendant. (*Id*. at 67.)

Moreover, as set forth in the discussion of the defendant's *Brady* issue, the defendant was permitted to impeach Russo's credibility on a variety of fronts, including his felony convictions and the illegal and corrupt conduct underlying those convictions,

---

[10] It was, however, a proper tool for refreshing the witness's memory. As previously stated, Russo was unsure about many of the details of the fundraiser in question, including its date, the location, and the subject of the fundraiser. The defendant was permitted to use the transcript from the call to attempt to refresh Russo's memory. In addition, it appeared from a portion of defense counsel's objection (that the Court was preventing the defendant from presenting her case) that she wished to use the recording to establish that Brendan Sheehan's fundraiser occurred *after* the DAS case settled. While she was free to offer such evidence in her case in chief, it would have been improper to offer it as impeachment during cross-examination, as her counsel attempted to do. *See United States v. Lemon*, 497 F.2d 854 (10th Cir. 1974) ("[A] prior inconsistent statement may be used solely insofar as it relates to credibility, and in no event is it to be considered for the truth of its contents.") In fact, the defendant had ample opportunity to elicit this information for its truth in her case in chief from individuals on her own witness list. For example, Brendan Sheehan, who was listed on the defendant's witness list, obviously could have testified on direct as to the date of his own fundraiser.

15

and his proffer agreement with the government whereby the government would recommend a reduced sentence in exchange for his cooperation.[11] *See United States v. George*, 532 F.3d 933, 936-38 (D.D.Cir. 2008) (Confrontation Clause not violated when the court refused cross-examination of witness regarding mental illness because the witness was already impeached by more damning evidence and no testimony suggesting witness's mental illness was relevant to her credibility); *United States v. Geames*, 427 F.3d 1333, 1337-39 (10th Cir. 2005) (Confrontation Clause not violated when court precluded cross-examination regarding witness's pending felony charge, service as informant, and owed child support because the defendant already extensively challenged the witness's credibility).

Having permitted the defendant to adequately subject Russo's testimony to "adversarial cross-examination," *see McCleskey*, 228 F.3d at 643, any error in the limitation placed on the defendant's cross-examination of this witness would have been harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (when a reviewing court determines that a trial court unconstitutionally limited the scope of cross-examination, it should apply the harmless error standard). For these reasons, the refusal to allow impeachment with the Dimora-Russo tape recording is not a substantial error that would support the granting of a new trial.

---

[11] Specifically, Russo admitted that he took cash from individuals seeking public jobs (Russo TR. at 61), that he took cash in exchange for raises (*Id*. at 62), that he took bribes in the form of Las Vegas trips (*Id*. at 62), and that he took bribes in exchange for reducing property taxes (*Id*. at 62).

16

3.          <u>Admission of the Defendant's Voice Mail Message was Proper</u>

Count 10 of the supplemental indictment alleged that the defendant lied when she "denied giving Frank Russo any special consideration with regard to any cases before her court." In support of this count, the government offered a voice mail message left by the defendant to Frank Russo, wherein the defendant advised Russo that she had granted a continuance in a criminal case so that the defense attorney in the case, Joe O'Malley, could assist Russo with regard to an inquiry by the media.

The defendant claims that this tape recording was improperly admitted because it was not relevant. Specifically, the defendant argues that no reasonable juror would have construed the agent's question, asking whether the defendant had ever given Russo any special consideration with respect to any case in her court, as referring to the granting of a continuance in a case so that the defense attorney could assist Russo in an unrelated matter. Because Russo was not a party to the criminal action, and otherwise had no interest in it, she argues that she could not possibly have interpreted the question as referring to such matters.[12] As such, the defendant insists that the voice mail message was not relevant, was highly prejudicial, and its introduction rendered the trial unfair.

The Court disagrees. While Russo did not have an interest in the criminal trial, itself, he had a vested interest in freeing up the defense attorney in the case, Joe O'Malley, to assist him in responding to an expected article by the Plain Dealer

---

[12]In support of her position, the defendant notes that Special Agent Curtis eventually asked the defendant about a different case, one sounding in bankruptcy, as a case in which the defendant was alleged to have given Russo special consideration.

investigating Russo's hiring practices at the Auditor's Office. Russo testified that O'Malley's help was "critical" as he explained that:

> "Joel [sic][O'Malley] had been with me for 18 years and knew every person that I hired, basically every move that I made, and he was very intuitive to the office and knew everything, so it was very, very, very helpful for him to go over the resumes. It was very helpful for him to meet with the Plain Dealer. Joel [sic] was an attorney. He was a good interviewer and I felt very comfortable with him, basically." (Russo TR at 33-34.)

All relevant evidence is admissible and evidence that is not relevant is not admissible. Fed. R. Evid. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The relevancy standard is liberal. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 587 (1993). A reasonable juror could have found, and the jury may well have found, that this evidence established that the defendant gave Frank Russo special consideration in a case, even if he was not a party to the case. Thus, the evidence was relevant, and properly admitted. Further, how the defendant interpreted the agent's question was a matter for the jury. *See United States v. Ahmed*, 472 F.3d 427, 433 (6th Cir. 2006) (citation omitted) (for purposes of 18 U.S.C. § 1001, how a defendant interpreted the question posed by a government official is a question properly left to the jury). This ground does not support the defendant's request for a new trial.

4.        <u>Judicial Code Expert Testimony was Properly Admitted</u>

Pursuant to Fed. R. Crim. P. 16, the government identified Lori Brown, Assistant to Ohio Disciplinary Counsel, as an expert witness who would be called at trial to offer testimony regarding certain standards contained in the Ohio Code of Judicial

Conduct, and the consequences of violating the judicial code. The defendant filed a motion in limine to exclude this testimony.

In an Opinion and Order dated March 22, 2011, the Court denied the motion, ruling that the evidence was admissible under Fed. R. Evid. 404(b), for the purpose of demonstrating motive. (*See* Doc. No. 243.) In reaching this conclusion, the Court observed that it was the government's theory that the defendant lied to the FBI about engaging in ex parte conversations with parties and non-parties to cases before her because she feared that she would face discipline under the judicial code if her conduct was made known. Employing the three-part test for admission of evidence of other acts under Rule 404(b), the Court found that the evidence was probative to demonstrate motive and its probative value substantially outweighed the potential prejudice.

In her motion for a new trial, the defendant lodges two chief complaints as to the use of Lori Brown's testimony at trial. First, the defendant complains that there was no basis for the introduction of this testimony because the defendant did not deny in her interview with the FBI that she had engaged in ex parte communications. At trial, however, Special Agent Greg Curtis testified that the defendant did initially deny that either Dimora or Russo had any contact with her about any cases in her court. (Doc. No. 290, Curtis TR. at 18-22; *see also* Doc. No. 289, Christine Oliver (Special Agent) TR at 11-12.) It was only after the agents told the defendant that they had tape recordings of her engaging in improper ex parte communications that she acknowledged that any such

conversations took place.[13] An initial final statement is sufficient to incur criminal liability under § 1001, even if the interviewee eventually recants inasmuch as there is no safe harbor for recantation or correction of a prior false statement under 18 U.S.C. § 1001.[14] *See United States v. Beaver*, 515 F.3d 730, 742 (7th Cir. 2008) (Section 1001 contains no recantation defense; "the materiality of [an accused's] false statements must be assessed at the moment he uttered them."); *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006) (Section 1001 does not have a safe harbor for subsequent recantation); *United States v. Sebaggala*, 256 F.3d 59, 64 (1st Cir. 2001) (same).

Even when she did ultimately concede that the conversations took place, after being confronted with evidence of her possible wrong-doing, she tailored her admission to fit within an exception to the ex parte rule or limited her admission to only a minor violation of the rule (at least according to her expert on the judicial code, Richard Koblentz). (Doc. No. 292, Koblentz TR at 39-40.) *See United States v. Brooks*, 379 F.3d 465, 46 (6th Cir. 2010) (while relying on the fact that the agent's knowledge of the falsity of an answer did not absolve the interviewee of criminal liability, the court cited with favor cases finding no defense where the admission only came after the interviewee was confronted with the government's evidence of the interviewee's wrongdoing).

---

[13] For example, Agent Curtis testified that the defendant eventually conceded that she may have discussed her court with Dimora, but such conversations were limited to his remarks that he had heard from attorneys appearing before her that she was doing a good job. (Curtis TR at 19.)

[14] Similarly, the defendant complains that she "freely admitted" that she had ex parte communications with Steven Pumper. However, Agent Oliver testified that the defendant only stated in her interview that, upon receiving a phone call from Pumper, she instructed him to discontinue the call and get the attorneys on the line; as such, she did not "freely admit" to any ethical wrong-doing. (Oliver TR at 13-14.) The defendant also denied that she attempted to sway the DAS litigation in Pumper's favor (*see* Curtis TR at 26-27; Oliver TR at 14); thus, denying another ethical violation for which Brown's testimony was required. Of course, the defendant's depiction of her actions as "freely admitting" ethical violations represents another attempt by her to badly misstate the record to suit her purposes.

Because the defendant's motive to lie to the FBI was clearly at issue in this case, and the jury required expert testimony on the judicial code, both to fully appreciate why a judge's ex parte communications can be inappropriate and that such violations of the code could lead to disciplinary action taken against the judge, Lori Brown's testimony was crucial for the jury's understanding of why the defendant might have been motivated to lie to the FBI and was, therefore, clearly relevant.

Second, the defendant complains that it was improper to permit Ms. Brown to answer hypothetical questions posed by the government regarding whether certain conduct would expose the hypothetical judge to disciplinary action. There was nothing improper about this procedure.

"Clearly, it is proper for a party to pose hypothetical questions to experts." *Jackson v. A.C. Prod. Liab. Trust*, 622 F. Supp. 2d 641, 646 (N.D. Ohio 2009). Such questions should be, however, "an accurate summation of the evidence already presented in the record and can neither add no distract from that evidence." *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975). *See Collins v. Penn Const. Transp.*, 497 F.2d 1296, 1298 (2d Cir. 1974) ("Counsel may ask a hypothetical question so long as he states the factual assumptions of the question. *See* Wigmore, Evidence §§ 672-686 (3d ed. 1940). Of course, if the party does not independently prove the facts assumed, the jury is free to disregard the conclusion of the witness.")

The defendant does not claim that the hypothetical questions were not based on facts in evidence. Quite the contrary, the defendant appears to claim that the hypothetical questions were too closely aligned with the evidence offered at trial with respect to the defendant's conduct. *But see United States v. Bilzerian*, 926 F.2d 1285,

21

1294 (2d Cir. 1991) ("The mere use of hypotheticals does not usurp the jury's function of applying the law to the facts of the case.") Of course, any concern that the jury's role was at risk of somehow being usurped by the use of these hypothetical questions was addressed when the Court instructed the jury as to how to treat opinion testimony. Specifically, with respect to the expert testimony of Lori Brown and Richard Koblentz, the defendant's expert on the judicial code, the jury was instructed:

> You have heard the testimony of Lori Brown and Richard Koblentz, who each testified as an opinion witness. You do not have to accept such a witness's opinion. In deciding how much weight to give it, you should consider the witness's qualifications and how the witness reached his/her conclusions. Also consider the other factors discussed in these instructions for weighing the credibility of witnesses. Remember that you alone decide how much of a witness's testimony to believe, and how much weight it deserves.

The Court also instructed the jury on their use of the evidence relating to the judicial code. Specifically, the jury was instructed:

> You have heard testimony indicating that as a judge, the defendant was governed by the canons of the Ohio Code of Judicial Conduct and other codes of conduct. Violations of the canons and other codes of conduct is not a crime and the defendant, Bridget McCafferty, is not charged with any such crime. You may consider this evidence only as evidence of the defendant's motive and for no other purpose.[15]

Further, Lori Brown did not give her opinion as to an ultimate issue, and was not permitted to offer her opinion as to whether she believed that the defendant violated the judicial code. *See United States v. Winkle,* 477 F.3d 407, 417 (6th Cir. 2007) (expert witness properly testified that the commission of certain acts constituted a crime);

---

[15] It should be noted that the defendant requested, and her counsel helped to craft, this instruction. Moreover, the Court permitted the defendant, through her counsel, to determine at what point in the trial the instruction was to be given.

*United States v. Monus*, 128 F.3d 376, 386 (6th Cir. 1997) (holding that expert testimony of IRS agent regarding tax liability did not usurp the function of the jury as agent did not give her opinion about the guilt of the defendant). Given the fact that the jurors were clearly instructed that they were the ultimate triers of fact, and were given specific instructions on how and for what purpose the judicial code and the expert testimony relating to the code could be used, the defendant's concerns of jury ursurption do not warrant a new trial. *See United States v. Glover*, 265 F.3d 337, 345 (6th Cir. 2001) ("The expert was only drawing on common sense when he gave his opinion as to the ultimate issue, and the jury was informed that it could accept or reject the expert's testimony, as it could with any other witness.")

     5.   <u>Admission of Recorded Conversation between Co-Conspirators Proper under Rule 801(d)(2)(E)</u>

The defendant challenges the Court's ruling at trial that a phone conversation between Dimora and Pumper was properly admitted as statements of co-conspirators under Rule 801(d)(2)(E) of the Federal Rules of Evidence. In ruling that the conversation was admissible under Rule 801(d)(2)(E), the Court found that a conspiracy existed, that the defendant was a part of that conspiracy, and that the statement in question was made during the course of and in furtherance of the conspiracy. (*See* Doc. No. 238 at 3.)

As she did at trial, the defendant complains that the ruling was erroneous because there was no evidence that the conspiracy involved a scheme that included the offering of bribes or kickbacks, as required under *Skilling v. United States*, 130 S. Ct. 2986 (2010). As the Court observed at trial, however, the Supreme Court's decision in

*Skilling* was restricted to "honest services" mail fraud under 18 U.S.C. §§ 1341, 1346. *Skilling*, 130 S Ct. at 2931. The conspiracy, in question, did not involve the attempt to deprive another of "honest services," but rather involved the plan or scheme to deprive another, Letter Perfect, of property or money in violation of 18 U.S.C. § 1349. *Skilling*, therefore, was inapposite. [16] *See United States v. Jones*, 408 Fed. Appx. 949, 952 (6th Cir. 2011) (noting that *Skilling* left intact non-honest services types of prosecution for fraud, including "money or property" mail fraud).

**6.**          <u>Renewal of Previous Motions</u>

Without argument or discussion, the defendant also incorporates by reference the arguments set forth in its previous motions challenging the sufficiency of the indictment and the supplemental indictment, the motion to suppress, and her motion for a bill of particulars. The Court finds no reason to revisit any of these prior rulings, and holds, for reasons previously set forth in its written rulings on these motions, that the motions are, again, denied, and do not warrant a new trial.

Finally, the defendant restates her objection to the jury charges, and specifically takes issue with the Court's refusal to give certain requested instructions (though fails to identify which instructions the Court allegedly erred in not giving). "A

---

[16]  The defendant also appears to challenge the admission of this recorded conversation on the ground that there was evidence introduced at trial that indicated that the DAS litigation was complex and that the settlement was not necessarily beneficial to either party. However, a fraudulent scheme need not result in actual harm. *See United States v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010) (finding that the mail fraud statute does not require proof that the intended victim was actually defrauded); *see, e.g., United States v. Fischl*, 797 F.2d 306, 311 (6th Cir. 1986) (in mail fraud scheme, the court rejected the argument that dismissal was necessary because no actual harm befell the state or public, finding that it was enough that the fraudulent scheme intended to deceive). Moreover, it is well settled that "[i]n order to convict for conspiracy, it is not necessary to prove that the conspiracy was successful." *Collins v. United States*, 284 F.2d 517 (6th Cir. 1960) (citing *Blum v. United States*, 46 F.2d 850 (6th Cir. 1931)).

trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge 'fails accurately to reflect the law.'" *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007) (citations omitted). "A judgment may be reversed based upon an improper jury instruction 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *Id*. at 527 (citations omitted). *See United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008) ("A trial court's refusal to give a requested jury instruction is reversible error only if the instruction is '(1) correct, (2) not substantially covered by the actual jury charge, and (3) so important that failure to give it substantial impairs [the] defendant's defense.'")

The jury instructions, as a whole, accurately reflected the law, and largely tracked the Sixth Circuit Pattern Jury Instructions. Many of the instructions requested by the defendant included either misstatements of the law or improper argument, were substantially covered by the actual jury charge, or would have been confusing to the jury. Moreover, the defendant cannot articulate how the rejection of any of her requested instructions deprived her of the right to adequately present her theory of the defense to the jury.

For all of the foregoing reasons, the defendant's motion for a new trial is DENIED.

**Motion for Acquittal**

Pursuant to Federal Rule of Criminal Procedure 29(a) and (c), the Court must enter a judgment acquittal of any offense for which the evidence is insufficient to sustain a conviction. The Court must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

25

elements of the crime beyond a reasonable doubt. *United States v. Mackey*, 265 F.3d 457, 460 (6th Cir. 2001) (citations omitted). In deciding a Rule 29 motion, the Court draws all inferences from the evidence in favor of the prosecution. *United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995). Unlike a motion for new trial, a court does not weigh the evidence, consider the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002). The question the court must ask is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989) (citation omitted).

By this motion, the defendant renews the Rule 29 motion for judgment of acquittal that she made at the close of the government's case, and adopts and incorporates by reference the arguments she made in support of that motion. For the reasons previously set forth by the Court on the record at trial, the Court again DENIES the motion.

**Motion for Arrest of Judgment**

Under Fed. R. Crim. P. 34, upon a defendant's motion or on its own, "the court must arrest judgment if: (1) the indictment or information does not charge an offense; or (2) the court does not have jurisdiction over the charged offense." In support of her motion, the defendant adopts and incorporates her arguments set forth in support of her motions to dismiss the indictment for failure to state an offense, as well as the arguments she offered in support of her motion to dismiss the supplement indictment for multiplicity. For the reasons set forth in its previous written opinion resolving the above-cited motions, the Court finds that the indictment and the supplemental indictment

properly charged an offense and that the Court had jurisdiction over the charges for which the defendant was convicted. (*See* Doc. No. 234.) As such, the Court DENIES the defendant's motion for arrest of judgment.

**Conclusion**

For all of the foregoing reasons, the defendant's motions for a new trial, for judgment of acquittal, and for arrest of judgment are DENIED.

**IT IS SO ORDERED**.

Dated: July 14, 2011

_____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**